Filed 9/12/13

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT


| | |
|---|---|
| ANDREA JOANNOU et al., | B241035 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC445457) |
| v. | |
| CITY OF RANCHO PALOS VERDES et al., | |
| Defendants and Respondents. | |


APPEAL from a judgment of the Superior Court of Los Angeles County. Alan S. Rosenfield, Judge.  Affirmed.

Law Offices of Douglas W. Beck & Associates and Douglas W. Beck for Plaintiffs and Appellants.


Richards, Watson & Gershon, Mitchell E. Abbott and Andrew J. Brady for Defendants and Respondents.


_____

Plaintiffs Andrea Joannou and 25 Oak, LLC, appeal from the summary judgment entered in favor of defendant City of Rancho Palos Verdes in their action to apply the Cullen Earthquake Act (Code Civ. Proc., § 751.50, et seq. ) to quiet title in them to city-owned land where homes they bought were deposited over the course of many years by a slow moving landslide. We affirm because the Cullen Act does not apply to lot line displacements resulting from ongoing and gradual earth movements.

## FACTS AND PROCEDURAL HISTORY

In 1956, road construction by Los Angeles County in a then unincorporated area of the Palos Verdes Hills known as Portugese Bend accidentally reactivated a sub-surface prehistoric slide area. That incident sent just under one square mile of hillside property on an ongoing, slow-motion, downhill journey that inexorably leads to a bluff overlooking the Pacific Ocean. As a result, homes built in the area have moved along with the land, in some cases outside their original lot lines and on to neighboring parcels. Homeowners in the area have turned to innovative methods of anchoring their homes in place even as the landslide moves down the hill. Some landowners in the affected area have also accommodated each other over the years by treating the earth movements as a de facto readjustment of their respective property lines.

The City of Rancho Palos Verdes incorporated in 1972 and includes the Portugese Bend area. The City then acquired title to the right of way for Palos Verdes Drive South, which cuts through the landslide area. In 1987, the City took title to a piece of land (Lot 1) in the slide area that sits directly south of the roadway of Palos Verdes Drive. Sometime between 1956 and 1987, two homes that were originally located north of the roadway on Lots 40 and 41 migrated approximately 300 feet south of the roadway and on to Lot 1. Those homes are now located at 40 and 41 Cherryhill Lane.

In 2005, Joannou bought the house on 40 Cherryhill Lane. Although the house was in poor condition, it was still occupied by the seller. Joannou spent $30,000 to remodel the house and intended to have a new foundation built. Joannou put up a fence to keep trespassers out while repairs were made to the home, which apparently drew the

2

attention of city building inspectors. The inspectors "red-tagged" as unsafe Joannou's home and the one that had moved along with it from Lot 41 to 41 Cherryhill Lane.

The City contended that Joannou had no right to occupy Lot 1. Over the next three years, Joannou and the City tried to negotiate an agreement that would allow her to lease a portion of Lot 1 from the City for a limited time and then repair and reside in the home on Cherryhill Lane. As part of this process, Joannou incurred approximately $100,000 in consulting fees from surveyors, civil engineers, geologists, and other experts in preparation for re-anchoring the Cherryhill Lane home on Lot 1. Ultimately, Joannou's negotiations with the City were unsuccessful.

Joannou sued the City to quiet title to a portion of Lot 1 under the Cullen Earthquake Act (Code Civ. Proc., §§ 751.50 – 751.65 (the Cullen Act or the Act)), which allows for the equitable adjustment of property lines that have been displaced by certain earth movements.[1] Joining her as a plaintiff was 25 Oak, LLC, which bought the house at 41 Cherryhill Lane in 2009. The owners of several nearby parcels also were named as defendants, including the owners of Lots 47 and 48, which the slide had relocated to the original position of Lots 40 and 41.[2] The second cause of action sought to quiet title to Lots 40 and 41 against the owners of Lots 47 and 48 and in favor of Joannou and 25 Oak should their Cullen Act action be unsuccessful.

The City moved for summary judgment on largely undisputed facts. The trial court granted summary adjudication of the first cause of action, concluding that the Cullen Act applied to only sudden earth movements that constituted disasters, not to gradual earth movements like the Portugese Bend Slide. The City was granted summary adjudication of the second cause of action because it claimed no right or title to the land

---

[1] Joannou sued in her capacity as trustee of the Andrea Joannou Trust of 2004. For ease of reference we refer to her as Joannou.

[2] Also named as defendants were Los Angeles County, the Portugese Bend Homeowners Association, and several banks. This matter is appealable because the judgment was final as to the City. Claims against other defendants are not at issue on appeal.

3

where the houses on Lots 40 and 41 originally were located. After judgment was entered for the City, Joannou and 25 Oak appealed, contending that the Cullen Act applied to their claim.[3]

## DISCUSSION

1. *Standard of Review and Rules of Statutory Interpretation*

This appeal is from a summary judgment where the sole issue is one of statutory interpretation based on undisputed facts. Accordingly, we exercise independent review and apply the ordinary rules for construing statutory language. (*MacIsaac v. Waste Management Collection & Recycling, Inc.* (2005) 134 Cal.App.4th 1076, 1081-1082.)

Under the rules of statutory construction, our primary task is to determine the Legislature's intent. The first step in the interpretive process is to examine the Legislature's chosen language, which is the best indicator of legislative intent. Unless the statute supplies a definition of specific terms, we give the words used a plain and commonsense meaning. If the statutory language is clear and unambiguous, there is no need for judicial construction. (*Alejo v. Torlakson* (2013) 212 Cal.App.4th 768, 787 (*Alejo*).) We need not follow the plain meaning of a statute when doing so would frustrate its purpose or lead to absurd results. Therefore, even though the words chosen by the Legislature are the best indicator of its intent, we do not view the language in isolation. Instead, we construe the words of a statute in context with an eye to fulfilling the statutory purpose. (*Ibid.*)

A statute is unambiguous if a party's proposed interpretation is the only reasonable interpretation. However, if there is more than one reasonable interpretation of statutory language, then an ambiguity exists. (*Mt. Hawley Insurance Co. v. Lopez* (2013) 215 Cal.App.4th 1385, 1398 (*Mt. Hawley Insurance*).) If so, we resort to secondary rules of construction. These include: maxims of construction, which express familiar insights

---

[3] Joannou and 25 Oak do not challenge the trial court's ruling on their second cause of action. We will sometimes refer to Joannou and 25 Oak collectively as appellants.

4

about conventional language usage; the legislative history; and the wider historical circumstances of a statute's enactment.**4** (*Alejo, supra,* 212 Cal.App.4th at p. 787.)

If the ambiguity is not resolved by these secondary rules of construction, we then apply reason, practicality, and common sense. (*Alejo, supra,* 212 Cal.App.4th at p. 788.) When doing so, we must consider the potential consequences of a particular interpretation. This includes not just the words chosen by the Legislature, but also matters such as context, the problem to be remedied, the history of the times, legislation on the same subject, public policy and contemporaneous construction. (*Ibid.*) These other matters are important because they elevate our analysis from an abstract exercise in semantics to the only reason we engage in the process at all – to determine the Legislature's intent in order to carry out the purpose of the law. (*Ibid.*)

2.      *The Cullen Earthquake Act*

The Legislature enacted the Cullen Act in 1972 in response to the 1971 Sylmar Earthquake, which disturbed existing property lines by shifting the land in some areas by several feet. (Dept. of Conservation, Enrolled Bill Rep. on Assem. Bill No. 2329 (1972 Reg. Sess.) [date illegible].) The Cullen Act provides that "[i]f the boundaries of land owned either by public or private entities have been disturbed by earth movements such as, but not limited to, slides, subsidence, lateral or vertical displacements or similar disasters caused by man, or by earthquake or other acts of God, so that such lands are in a location different from that at which they were located prior to the disaster, an action in rem may be brought to equitably reestablish boundaries and to quiet title to land within the boundaries so reestablished." (Code Civ. Proc., § 751.50.)**5**

Cullen Act actions may be brought by a county or city where lands were affected by a disaster, and by any other person or entity that owns or has an interest in land

---

**4**      We discuss the proper use of legislative history sources in section 4 of our DISCUSSION, *post*.

**5**      All further undesignated section references are to the Code of Civil Procedure.

affected by the disaster.  (§ 751.51.)  The complaint must describe and specify the exterior boundaries of the real property affected by the action, along with a proposed replatting of that property that "embod[ies] the land boundaries as fixed by the disaster." (§ 751.53, subds. (a)-(f).)  The judgment shall determine the boundaries of each parcel of land at issue in the action "as fixed by the disaster," and approve and direct the filing of an official map of the affected land as a substitute for the plat maps previously filed. (§ 751.60, subds. (a), (c).)

When reaching its conclusions, the trial court must "give effect to the changes in land boundaries caused by the disaster, mitigated, however," by certain equitable considerations.  (§ 751.61.)  The judgment is conclusive as to the land boundaries of every person or entity that had or claimed some right or interest in property subject to the action, as well as those claiming under any of them.  (§ 751.62.)  The remedies provided by the Cullen Act are cumulative and in addition to any other remedies available for quieting or establishing title to real property.  (§ 751.64.)

The Legislature had several express purposes in mind when it passed the Cullen Act:

"(1)  Making fully available for continued use and new development the entire area owned by each entity, whether public or private, which purpose can only be accomplished by reestablishing with certainty the present location of land boundaries.

"(2)  Facilitating the sale, mortgage or lease of land parcels in the state.

"(3)  Confirming and establishing the exact areas available for public use in streets, highways, flood control channels, public utility and other public ways.

"(4)  Minimizing the loss of area by property owners whose boundaries have been disturbed by earth movements such as but not limited to slides, subsidence, lateral or vertical displacements or similar disasters caused by man or by earthquakes or other acts of God, by equitably reestablishing property lines or by allocating to adjacent owners areas of land released by the narrowing or relocating the lines of public streets, highways or other public ways, with the consent of the city, county or state, as the case may be,

6

under whose jurisdiction such streets, highways or ways are vested, given for the promotion of the general welfare.

"(5) By declaring lots or parcels of land made substandard in size according to existing zoning laws as a result of compaction or other earth movement, of legal size according to such laws where no equitable adjustment of boundaries can be reasonably made.

"(6) Correcting existing public records by recording the results of judicial proceedings, including official maps which reflect the land boundaries reestablished subsequent to the disasters described in paragraph (4).

"(7) Permitting these ends to be accomplished in a single action in rem, brought with respect to a reasonably large land area affected by the disaster, rather than in numerous actions affecting single or a small number of parcels of land." (See Historical Note, 17A West's Ann. Code Civ. Proc. (1980 ed.) foll. § 751.50, p. 348.)

3.      *The Term "Disaster" Does Not Include Gradual Earth Movements*

The City contends that the Cullen Act's frequent references to "disasters" and adjusting boundaries as "fixed" by a disaster show that the Act was designed to apply to boundary disputes resulting from earth movements that qualify as disasters. (*Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 743 [qualifying words or phrases in a statute will be applied to terms that precede or follow it when the sense of the entire act requires it].) Because the Cullen Act does not define disaster, the City asks us to apply the conventional definition of the term in the context of this case (*Heritage Residential Care, Inc. v. Division of Labor Standards Enforcement* (2011) 192 Cal.App.4th 75, 82), which they contend is limited to sudden or abrupt earth movements only.

Appellants concede that the Cullen Act applies only to earth movements that are disasters, but contend that the term "disaster" is flexible enough to cover gradual earth movements and that their interpretation is consistent with both the legislative intent of the Cullen Act and the broad category of earth movements set forth in the Act.

7

A disaster is commonly defined as "a sudden calamitous event," and connotes a "lack of foresight." (Webster's New International Dictionary (3d ed. 2002), p. 643.) Other reference sources give it a potentially broader temporal duration. (The Free Dictionary, https://www.thefreedictionary.com/disaster [a disaster is "[a]n occurrence causing widespread destruction and distress; a catastrophe," or "[a] grave misfortune"].) Although broader definitions of "disaster" exist, we believe that when it comes to earth movements, the conventional and commonly understood definition refers to those that are sudden or instantaneous.

This conclusion finds support in *T. L. Enterprises, Inc. v. County of Los Angeles* (1989) 215 Cal.App.3d 876 (*T. L. Enterprises*), which interpreted a statute that allowed real property owners to reduce the assessed value of their property if it was damaged by "disaster, misfortune, or calamity." (Rev. & Tax. Code, § 51, subd. (c).) The plaintiff owned an office building that sustained costly damage due to settling of the foundation over a nine-year period. His request to reduce the assessed value of the building was denied by the county because the damage had not been caused by a disaster, misfortune, or calamity. The Court of Appeal affirmed.

Turning to a dictionary definition, the court said a disaster was " 'a sudden calamitous event producing great material damage, loss, and distress.' It similarly defines calamity . . . as 'an extraordinarily grave event marked by great loss and lasting distress and affliction.' Misfortune, 'an instance of bad luck' [citation], connotes a less serious incident than disaster or calamity. All require at a minimum some event out of the ordinary. [¶] Appellant has not shown that its loss was caused by such an occurrence. Although appellant undoubtedly considers the decrease in value a misfortune, it was the result of ordinary natural forces. *Because it took place over a period of years appellant was not in the position of the victim of earthquake, flood, or fire: it could take steps to alleviate the consequences.*" (*T. L. Enterprises, supra,* 215 Cal.App.3d at p. 880, quoting Webster's New International Dictionary (3d ed. 1981), pp. 314, 643, 1443, italics added.) That is precisely what happened here.

8

Our conclusion that gradual, ongoing earth movements do not qualify as disasters also finds support in two other separate statutory schemes. We begin with two related rules of statutory construction. First, a term having a specific meaning in one area of the law normally should be given the same construction when it appears elsewhere. (*Britts v. Superior Court* (2006) 145 Cal.App.4th 1112, 1127.) Second, under this rule of statutory interpretation we presume the Legislature meant to give the same meaning to similar phrases unless a contrary intention appears. (*Scottsdale Ins. Co. v. State Farm Mutual Automobile Ins. Co.* (2005) 130 Cal.App.4th 890, 899.)[6]

One of the separate statutory schemes we rely on distinguishes earthquakes and other sudden earth movements from slow-moving slides like the one in Portugese Bend. Government Code sections 865 through 867 provide local public entities with immunity from liability arising out of actions they take to prevent damage from *gradual earth movements*.

In enacting these sections, the Legislature found that the "gradual movement of land, *such as in prehistoric slide areas*," or from other loss of underground support "can result in danger to persons or property." (Gov. Code, § 865, subd. (a), italics added.) "*Unlike an earthquake or rapid rockslide or landslide, these gradual earth movements* permit possible intervention to arrest the movement" and head off any damage to persons or property. Immunity was necessary in order to encourage local public entities to take remedial action to alleviate the hazards of such earth movements. (*Ibid.*, italics added.) "Gradual earth movements" are defined to include "perceptible changes in the earth either in a subterranean area or at the surface, or both, which if not arrested or contained will *over a gradual period of time* result in damage to or destruction of underground or aboveground property or harm to persons." (Gov. Code, § 866, subd. (a)(3), italics added.)

Thus, in Government Code sections 865 and 866, the Legislature has drawn a distinction between earthquakes and rapid rockslides on the one hand and the gradual

---

[6] We asked for and received supplemental briefing on this issue from the parties.

movement of prehistoric slide areas on the other because "gradual earth movements permit possible intervention to arrest the movement and *avoid harm . . . .*" (Gov. Code, § 865, subd. (a), italics added.)  As a result, the statute refers to gradual earth movements as "hazard[s]" that may "result in *possible damage*." (Gov. Code, § 865, subds. (a), (b), (italics added).)[7]

The other separate statutory scheme we examine is the California Emergency Services Act (Gov. Code, § 8550, et seq. (the Emergency Services Act)), which was enacted two years before the Cullen Act.  (Stats. 1970, c. 1454, p. 2845, § 2.)  Under this act, an emergency is defined as "the duly proclaimed existence of conditions of *disaster* or of extreme peril . . . caused by such conditions as air pollution, fire, flood, storm, epidemic, drought, sudden and severe energy shortage, plant or animal infestation or disease, . . . or *an earthquake . . .*" of such magnitude that they are beyond the control of the resources of a single public entity and require the assistance of combined forces. (Gov. Code, § 8558, subds. (b), (c), italics added.)  When enacting this law, the Legislature found that coordinating the response of public agencies was necessary to protect Californians from "the destructive impact of disasters and other massive emergencies . . . ."  (Gov. Code, § 8588.3, subd. (a).)

Application of the interpretive canon *ejusdem generis* is instructive at this point. Under that rule, when a general term or category is preceded or followed by specific

---

[7]    Appellants point to other statutes that expressly recognize the distinction between land failures caused by both rapid and gradual earth movements and contend that the Legislature's failure to draw the same distinction in the Cullen Act shows that it intended to include both types of earth movements within its scope.  (See Gov. Code, § 831.25 [tort immunity for public entity from injury occurring due to natural condition of unimproved public land; land failure includes rapid and gradual earth movements]; Pub. Resources Code, § 21080.33 [exemption from environmental impact report requirement for emergency repairs to highways damaged by several causes, including earthquake and gradual earth movements]; Wat. Code, § 13269, subd. (c)(2) [exemption from waste discharge requirements for emergency repairs on scenic highways due to several causes, including earthquake and gradual earth movement].)  We disagree.  By limiting the Cullen Act to earth movements that are disasters, the Legislature has in fact drawn that distinction.

words, the general category is restricted to those things that are similar to those specifically enumerated. (*People v. Arias* (2008) 45 Cal.4th 169, 180.) The Emergency Services Act's list of possible disasters includes some conditions that develop over time (drought, epidemics, plant and animal infestations), and others that are swift or instantaneous (fire, flood, storm). Earthquakes, which are instantaneous, are the only earth movement listed. (Gov. Code, § 8558, subds. (b), (c).)

As Government Code sections 865 and 866 make clear, the Legislature is aware of the difference between rapid earth movements like earthquakes and gradual ones like prehistoric slides, yet when it came to earth movements, chose to limit its list of disasters to earthquakes. We do not believe this excludes other types of earth movements from being disasters under the Emergency Services Act so long as they inflict the requisite level of harm. However, applying the *ejusdem generis* rule of statutory construction, we do believe it defines the temporal parameters of the types of earth movements that qualify as such.

We distill the following from these two disparate statutory schemes. First, the Legislature views slow-moving landslides as a type of earth movement that deserves separate treatment from rapid movements like earthquakes because the latter cause immediate damage while the former permit intervention before damage occurs. Second, the type of earth movements that qualify as disasters under the Emergency Services Act are in the same temporal category as earthquakes. This leads us to conclude that the Legislature does not consider gradual earth movements like the Portugese Bend slide to be disasters.

4. *Ongoing and Gradual Earth Movements Are Not "Fixed" as Required By the Cullen Act*

Even if the Cullen Act could be read to include gradual earth movements as disasters, the Act still would not apply because the landslide is ongoing, and therefore the affected land is not "fixed" as that term is used in the statute. Various sections of the Cullen Act contemplate that at the conclusion of litigation any judgment for the plaintiffs

11

will establish new boundaries. (See e.g., §§ 751.50, 751.52, 751.53, 751.56, subd. (c), 751.58, 751.60, subd. (a).) Especially significant is subdivision (f) of section 751.53 which requires that all complaints filed under the Cullen Act include:

"A proposed replatting of the entire real property sought to be affected by the action, embodying the land boundaries as fixed by the disaster, except as these boundaries have been equitably and judicially readjusted, or as liberalized by judicially directed use of the vacated lands."

The property in question has been sliding for nearly 60 years. Moving land is not "fixed." The record reflects that the land has been moving throughout this litigation and when the lawsuit is concluded the land will continue to move until it reaches the Pacific Ocean. In no sense of the word can it be said that the boundaries have become or will become fixed until perhaps it sadly splashes into the sea. Indeed the record seems to support the inference that nearly as soon as the ink is dry on the judgment appellants have sought in this case, a new application could be filed because the land would have moved again. Such repetitive applications are not contemplated by the Cullen Act, which assumes that at the end of the case the boundaries will have "been fixed." Neither would a new boundary have been "reestablished" as is required by section 751.50 ["... an action in rem may be brought to equitably reestablish boundaries and to quiet title to land within the boundaries so reestablished."].

5. *The Legislative History of the Cullen Act Shows That It Excludes Gradual Earth Movements*

To the extent any ambiguity exists concerning the Cullen Act's use of the terms "disaster" and "fixed," we look to the Act's legislative history, including a failed attempt to amend the Act to expressly include slow-moving landslides. In doing so, we examine the Legislative Counsel's Digest and other summaries and reports that indicate the Legislature's intent. (*Mt. Hawley Insurance, supra,* 215 Cal.App.4th at p. 1401.) The Legislative Counsel's digest is the official summary of the legal effect of a bill and is relied upon by the Legislature throughout the legislative process. (*Ibid.*) As a result, the

12

digest is entitled to great weight, but is not binding. (*Ibid.*) Reports of legislative committees and analysts are also useful indicators of legislative intent, but material showing the motive or understanding of the bill's author or other interested persons is generally not considered. (*Ibid.*)

A. Legislative History of the Cullen Act

When the Cullen Act was introduced in April 1972, the proposed legislation was dubbed the "Earthslide Relief Act." (Legis. Counsel's Dig., Assem. Bill No. 2329 (1972 Reg. Sess., Stats. 1972, Summary Dig., p. 5.) It would apply when land boundaries were moved "by an act of God, consisting of an earthslide . . . ." However, the subject heading that prefaced the proposed bill described it as "*An act relating to earthquakes*". (Original italics.) (*Id.* at p. 1.)

The enrolled bill report said it was the "[r]esult of *[sic]* San Fernando earthquake," and would "provide procedures for readjusting property boundaries and reestablishing title to such lands disturbed by earthquakes . . . ." (Dept. of Conservation, Enrolled Bill Rep. on Assem. Bill No. 2329 (1972 Reg. Sess.) [date illegible].) A report of the Assembly Judiciary Committee said the proposed bill was designed to remedy title and boundary problems caused by the Sylmar Earthquake. No other causes of land movements were mentioned, but the report questioned why it was limited to naturally-caused earthquakes, noting that a nuclear bomb test could set off an earthquake or tidal wave. (Assem. Com. on Judiciary, Rep. on Assem. Bill No. 2329 (1972 Reg. Sess.) May 22, 1972.)

The bill was then amended into its current form and renamed the "Earth Movement Disaster Act". (Leg. Counsel's Dig., Assem. Amends. to Assem. Bill No. 2329 (1972 Reg. Sess.) May 24, 1972.) The Legislative Counsel's Digest said the bill had been expanded to apply to lands "disturbed by earthquakes *and other disasters*, including those resulting from acts of man." (*Ibid.*) The bill was amended one more time to change its name to the Cullen Earthquake Act. (Leg. Counsel's Dig., Sen. Amends. to Assem. Bill No. 2329 (1972 Reg. Sess.) June 19, 1972, italics added.)

13

The City contends that this legislative history shows the Legislature had sudden events like earthquakes in mind when it enacted the Cullen Act. Although the City's interpretation is reasonable, the legislative history does not address whether "other disasters" under the Cullen Act are limited to one-time, sudden earth movements. Given the broad and non-exclusive listing of earth movements covered by the Act (§ 751.50), it could be interpreted to apply to all earth movements regardless of the rate at which they occur.

### B. The 2008 Failed Attempt to Amend the Cullen Act

In February 2008, a proposed amendment to the Cullen Act was introduced that would have changed section 751.50 to state that the Act applied to "any earth movement, abrupt or gradual, including, but not limited to, slides, subsidence, or lateral or vertical displacements, whether caused by nature or man, so that these lands are in a location different from that at which they were located prior to the movement." (Italics omitted.) According to the Legislative Counsel's Digest, the Cullen Act referred to the types of earth movements within its reach as disasters. The amended bill would "specify that the authority to bring an action [under the Cullen Act] applies to any earth movement, whether abrupt or gradual, and would remove references to these earth movements as disasters." (Leg. Counsel's Dig., Assem. Bill No. 2479 (2007-2008 Reg. Sess.) Summary Dig., p. 97.)

The proposed revision was amended a few months later to provide instead for a study by the California Geological Survey to determine whether a quiet title cause of action based on gradual earth movements "should be established." (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 2479 (2007-2008 Reg. Sess.) as amended June 30, 2008, p. 1.) The Judiciary Committee report said that a series of gradual earth movements in the Oakland Bay Area had prompted some litigants to assert remedies under the Cullen Act. An arbitrator hearing one such dispute ruled that the Cullen Act did not apply to gradual earth movements, prompting the bill's author to conclude that there was no existing authority that allowed for the readjustment of property lines in such

14

cases. (*Id.* at pp. 2-4.) The report also said that "the Cullen Act provides a remedy for landowners to reestablish land boundaries altered by abrupt movements caused by natural disasters. The author has identified a legitimate problem in that *current law regarding the reestablishment of boundaries due to earth movements does not apply to scenarios where boundary lines have shifted due to gradual earth movements.*" (Italics added.) (*Id.* at pp. 4-5.)

Although neither proposal passed, the City contends we may rely on them to interpret the Cullen Act. According to the City, these unsuccessful proposals show that the Cullen Act does not apply to gradual earth movements. Appellants contend these failed measures are not relevant because only three members of an Assembly Committee voted to recommend one of the proposed bills, which was then amended out of existence into a provision concerning bottled water. (Legis. Counsel's Dig., Sen. Amends. to Assem. Bill No. 2479 (2007-2008 Reg. Sess.).) They also contend that the proposed legislation reflected nothing more than the opinion of its author that the Cullen Act did not apply to gradual earth movements.

As a general rule, unpassed legislation provides "very limited guidance" when interpreting existing legislation. (*Grupe Development Co. v. Superior Court* (1993) 4 Cal.4th 911, 922-923.) However, in some circumstances it may be a reliable indicator of existing legislative intent. (*Gay Law Students Assn. v. Pacific Tel. & Tel. Co.* (1979) 24 Cal.3d 458, 480, fn. 13; *Seibert v. Sears, Roebuck & Co.* (1975) 45 Cal.App.3d 1, 19.)

We believe the legislative history surrounding the unsuccessful attempts to address the issue of gradual earth movements does offer some guidance to our interpretation of the Cullen Act. The initial amendment would have changed the Cullen Act by deleting all references to disasters and state instead that it applied to "any earth movement, abrupt or gradual, . . ." The Legislative Counsel's Digest said this amendment would *specify* that the Act applied to such earth movements.[8] Although "specify" is capable of more

---

[8]    When appellants discuss this, they refer to it as an attempt to "clarify" that the Cullen Act applied to gradual earth movements. That term never appears in the proposed 2008 amendments or their legislative history, however.

than one meaning, its use instead of "clarify" at least suggests that "disaster" as used in the Cullen Act does not include gradual earth movements and that a change was considered to address that omission. The Judiciary Committee's report on the amended version of that proposal – calling for a study of the issue – said the intent was to determine whether a cause of action arising from gradual earth movements "should be established," and that the Act applied to only abrupt movements. These statements also lend support to our conclusion.[9]

6.      *Conclusion: The Cullen Act Does Not Apply to Gradual Earth Movements*

Summing up, the conventional meaning of "disaster" as applied to earth movements does not include gradual and ongoing earth movements like the Portugese Bend Slide. As discussed above, this conclusion finds support in the Emergency Services Act's reference to earthquakes as disasters as well as in the government tort immunity provisions that distinguish between gradual and rapid earth movements because the former pose a risk of harm over time that can be abated. It also finds support in the 2008 failed attempts to address the issue of gradual earth movements in the Cullen Act. We believe this definition is consistent with and applies to the Cullen Act.

As previously discussed, the entire statutory scheme is predicated on the need to equitably readjust property boundaries that have become *fixed* after a disaster. The judgment in such an action must determine the boundaries of the affected property "as fixed by the disaster" and then approve and order the filing of a new plat map to serve as the official map for those properties. (§ 751.60, subds. (a), (c).) The judgment is conclusive as to the entire affected area. (§ 751.61.) The Legislature intended that this be done in a single action "with respect to a reasonably large land area affected by the disaster" instead of in multiple actions affecting a few parcels. This would "reestablish

---

[9]      We do not consider statements by the author of the proposed amendments concerning her own subjective beliefs, or any part of the legislative history that purports to rely on interpretations of the Cullen Act by arbitrators or trial courts.

16

with certainty the present location of land boundaries." (See Historical Note, 17A West's Ann. Code Civ. Proc. (1980 ed.) foll. § 751.50, p. 348.)

The Portugese Bend Slide has been in progress for 57 years and counting. Nothing about it is "fixed." As a result, there is no way to comply with the Act's requirements or satisfy the Legislature's intent of establishing certainty over the new land boundaries in a single conclusive action. We sympathize with appellants' plight and share their concern that the absence of an effective remedy in cases like this may lead to inequitable results.[10] We also agree that it is an issue the Cullen Act could have addressed. However, the gradual movement of land in the Portugese Bend area is not a disaster as that term is commonly understood or as intended by the Cullen Act.[11]

## DISPOSITION

The judgment is affirmed. The parties shall bear their own costs on appeal.

RUBIN, J.

WE CONCUR:

BIGELOW, P. J.

EPSTEIN, J.[*]

---

[10]    We note that appellants still have a quiet title cause of action against those homeowners claiming title to Lots 40 and 41, which was the original location of appellants' homes. We express no opinion on the merits of that claim.

[11]    Although we have borrowed from the Emergency Services Act to help define the term "disaster," we do so only as to the temporal aspect of that concept – a sudden earth movement – and not as to the scope or extent of damage. Therefore, we do not hold that a disaster under the Cullen Act must also qualify as a disaster for purposes of the Emergency Services Act.

[*]    Presiding Justice of the Court of Appeal, Second Appellate District, Division Four, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.